## Hepps v. Philadelphia Newspapers, Inc.

*Edwin P. Rome* and *William H. Lamb*, for plaintiffs.

*David H. Marion* and *Richard Cantor*, for defendants.

SUGERMAN, *J.*, March 16, 1977 — The case before us requires a response to a novel and impor-

tant question: May a plaintiff in a libel action against a newspaper obtain pretrial discovery of notes made by a reporter while interviewing informants in the course of preparation of a series of news articles thereafter published and allegedly libelous? The question presents an issue of first impression in Pennsylvania.

From the complaint we observe that Maurice Hepps, the individual plaintiff, is the principal stockholder of the corporate plaintiff, General Programming, Inc. ("General"). The latter entity owns the trademarks "Thrifty Beverage" and "Brewer's Outlet," and licenses such marks, and provides management and consultation services to licensees. The remaining corporate and individual plaintiffs ("Thrifty Beverage"), some 19 in number, are allegedly licensees of General and engaged in the business of distributing beer and soda in Pennsylvania.

The corporate defendant, Philadelphia Newspapers, Inc. ("PNI"), publishes the Philadelphia Inquirer, a newspaper of general circulation[1] in the Delaware Valley. The individual defendants, William Ecenbarger ("Ecenbarger"), and William Lambert ("Lambert"), are employed by PNI as news reporters.

In their capacity as reporters, Ecenbarger and Lambert prepared a series of articles, later published in the Inquirer, concerning Hepps, General and Thrifty Beverage. The articles endeavor to connect Hepps, General and Thrifty Beverage to certain named "underworld" figures, and organized crime in general. As one such example, in an article published in the Inquirer on May 5,

1. Act of May 16, 1929, P.L. 1784, sec. 3, as amended, 45 P.S. §3(4).

1975, under the byline of Ecenbarger and bearing the headline: "HOW MAZZEI USED PULL, KEPT BEER CHAIN INTACT," the reporter asserts that former State Senator Frank Mazzei, described variously as a convicted felon and an extortionist, used improper influence or "political muscle" to subvert a ruling of the Pennsylvania Liquor Control Board. The article further asserts that while there is no visible financial link between Mazzei and Thrifty Beverage, " . . . there is a clear pattern of interference in state government by Mazzei on behalf of Hepps and Thrifty." Finally, in the same article, Ecenbarger reports that "Mazzei has several underworld associates, one of which is Joseph Scalleat of Hazleton, who is described by the State Crime Commission as a Cosa Nostra leader . . . " and that " . . . Scalleat's wife[2] is a licensed Thrifty distributor in Bucks County."

Alleging the libelous character of such articles, the individual and corporate plaintiffs filed their complaint in trespass against defendants on May 4, 1976.[3]

On May 12, 1976, plaintiffs moved for inspection of documents pursuant to Pa. R.C.P. 4009. On the same day, the court, by the Honorable John M. Wajert, ordered defendants to produce the requested documents for inspection by plaintiffs, but vacated its order on June 1, 1976, so as to permit defendants to file an answer to plaintiffs' motion for inspection. Such answer was filed on June 21, 1976, and admitted possession of the requested

2. Later corrected by the Inquirer to read "sister-in-law." See Exhibit B to plaintiffs' complaint.

3. A corporation may, of course, recover in an action grounded on defamation: Cosgrove Studio & Camera Shop v. Pane, 408 Pa. 314, 182 A.2d 751 (1962).

documents, but asserted that the same were irrelevant to plaintiffs' cause, plaintiffs' request was made in bad faith, and production would be burdensome and oppressive to defendants. In new matter, defendants claim the news reporter's statutory privilege as to those documents that might suggest or reveal the "sources of defendants' articles."

Although not required to do so, defendants thereafter answered plaintiffs' complaint, admitting the employment of Ecenbarger and Lambert by PNI, and the publication by PNI of the allegedly offending articles. In new matter, defendants assert a series of defenses to plaintiffs' libel action, including truth, fair and accurate reporting on the conduct of public officials and public figures, and publication in good faith, without malice, based upon reliable sources. Plaintiffs replied to the new matter, denying the factual allegations contained therein.

## ISSUES

As later refined and narrowed by the parties, plaintiffs' motion for production of documents seeks discovery of notes and memoranda made by reporters Ecenbarger and Lambert in the course of interviews conducted while preparing the articles ultimately published by the Inquirer. Defendants have refused to produce such materials, contending that the same will reveal confidential sources or may lead to the discovery or revelation of such sources, and that such materials are, therefore, privileged under the Pennsylvania statute according newsmen the privilege of nondisclosure of sources of information, and thus not a proper subject of discovery as provided in Pa. R.C.P. 4011(c).

Plaintiffs' motion for production also demands inspection of "[a]ll documents [in the possession or control of defendants] concerning the performance of either individual defendant in the course of his employment with the Philadelphia Newspapers, Inc."

Defendants refuse to produce such documents on the several bases that such records are irrelevant to plaintiffs' cause, are "confidential and highly personal records," and plaintiffs' request is designed to "harass and annoy" defendants.

Lastly, plaintiffs' motion seeks production of "all articles published in The Philadelphia Inquirer authored [sic] by William Ecenbarger or William Lambert, either individually or jointly with any other person." Defendants refuse plaintiffs' latter request, as well, contending that such articles are, again, irrelevant to plaintiffs' cause, and that the request is made in bad faith with the intent to require an unreasonable investigation and cause unreasonable annoyance, expense and oppression. We treat the issues so defined seriatim.

## (1) Reporters' Notes

We consider first the more difficult issue before us, and the matter most vigorously and ably argued by the parties.

Following argument but prior to submission of the instant motion for decision, defendants responded to plaintiffs' first set of interrogatories and in their answers, defendants disclosed the identity of 15 sources of information. As a result, although plaintiffs' requests for production are broadly phrased,[4] the parties have narrowed and

---

4. See plaintiffs' motion for production, pars. 1-5, 7, 8.

limited the issue for decision to the matter of the production of notes made by defendant reporters in the course of interviews with various informants while preparing the allegedly libelous articles for publication. The parties agree that the notes are of two classes: (1) Notes of interviews with disclosed informants which do not reveal and cannot lead to the revelation of the identity of confidential informants, and (2) notes of interviews with both disclosed and confidential informants which either reveal, or might lead to the revelation of, the identity of confidential informants.

Defendants resist production of notes of both classes on four grounds: (1) The notes are protected from discovery, or "privileged" under the First Amendment to the Constitution of the United States; (2) plaintiffs' motion is premature; (3) the notes are protected from discovery under a "thought process privilege," available to news editors and presumably investigative reporters; and (4) the notes are protected from discovery under the privilege accorded news media personnel by the Pennsylvania statute permitting the nondisclosure of sources of information. In view of our disposition, we need treat only the last of these.

As Professor Wigmore has observed, the mere fact that a communication between a journalist and an informant was made in express confidence, or in the implied confidence of a confidential relation does not create a privilege of nondisclosure at common law: 8 Wigmore §2286 (McNaughton rev. 1961):

"This common law rule is not questioned today. No pledge of privacy nor oath of secrecy can avail against demand for truth in a court of justice. Accordingly, in the absence of a statute to the con-

trary, a confidential communication . . . to a . . . journalist . . . is not privileged from disclosure." Id. at 528, 529, 530.

Nor does it appear that there is an absolute constitutional testimonial privilege permitting nondisclosure of sources accorded to news reporters under the First Amendment or the Constitution of Pennsylvania. See, for example: Branzburg v. Hayes, 408 U.S. 665, 92 S. Ct. 2646, 33 L.Ed. 2d 626 (1972) (grand jury proceedings); Garland v. Torre, 259 F.2d 545 (2d Cir. 1958), cert. denied, 358 U.S. 910, 79 S. Ct. 237, 3 L.Ed. 2d 231 (1958) (libel action); Taylor and Selby Appeals, 412 Pa. 32, 40, 193 A.2d 181, 184 (1963).

As a consequence, the legislature of Pennsylvania created a testimonial privilege permitting news reporters and other media personnel to refuse to disclose sources of information.[5] It is this statute upon which defendants rely in their refusal to produce reporters' notes.

The privilege of nondisclosure was created by the Act of June 25, 1937, P.L. 2123, sec. 1, as amended December 1, 1959, P.L. 1669, sec. 1, and July 31, 1968, P.L. 858, sec. 1, 28 P.S. §330, and it provides, in pertinent part:

"No person, engaged on, connected with, or employed by any newspaper of general circulation as defined by the laws of this Commonwealth, or any press association or any radio or television station, or any magazine of general circulation, for the

---

5. The legislature has statutorily extended the privilege of nondisclosure to communications between spouses (28 P.S. §316); attorney and client (28 P.S. §321); physician and patient (28 P.S. §328); clergyman and penitent (28 P.S. §331); and accountant and client, Act of May 26, 1947, P.L. 318, as amended, 63 P.S. §9.11(a).

purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any court, grand jury, traverse or petit jury, or any officer thereof, before the General Assembly or any committee thereof, before any commission, department, or bureau of this Commonwealth, or before any county or municipal body, officer, or committee thereof."

The statute and its scope have been construed and interpreted in only one appellate decision in Pennsylvania: Taylor supra, before the Supreme Court of Pennsylvania as the result of orders of a lower court adjudging Robert L. Taylor, General Manager of the Evening and Sunday Bulletin, and Earl Selby, City Editor of the same publication, in contempt. Because of the importance of the decision to our task, we set out the facts at length.

In preparation for an investigating grand jury, to be convened in November 1962 for the purpose of investigating corruption in city government, an assistant district attorney of Philadelphia, in February 1962, interviewed one John Fitzpatrick.

On December 30, 1962, the Bulletin published an article entitled "Fitzpatrick's Secret Talk to D. A. is Bared." The article consisted principally of questions put to and answers made by Fitzpatrick at the February interview with the assistant district attorney. The article also referred to the end of the interview when the assistant district attorney said that he would review the record for further questions, and the article then added: *"However, much of the subsequent questioning dealt with what John Fitzpatrick had told Bulletin reporters."*

In January, 1963, a subpoena duces tecum was served upon Taylor and Selby, directing them to appear before the investigating grand jury and bring with them:

"(a) 'All tape recordings, written statements, Memoranda of interviews, conversations, conferences had with John J. Fitzpatrick'; and (b) 'All copies of statements given by John J. Fitzpatrick to the District Attorney [footnote omitted] on February 20, 1962, portions of which appeared in the Philadelphia Evening Bulletin on December 30, 1962;' and (a) 'all tape recordings of conferences, interviews, discussions, interrogations or conversations with John Fitzpatrick'; (b) 'all memorandum, notes, reports and other documents of or pertaining to conferences, interviews, discussions, interrogations or conversations with John Fitzpatrick'; (c) 'all memorandum, notes, reports and other documents of or pertaining to investigations conducted as a result of information furnished by John Fitzpatrick'; (d) 'all records of expenses incurred directly or indirectly in gathering information from, or conducting conferences, investigations, discussions, interrogations or conversations with John Fitzpatrick'; (e) 'all documents of or pertaining to the examination of John Fitzpatrick by polygraph, examiners, physicians, psychologists or other experts'; and (f) 'any and all other documents of or pertaining to John Fitzpatrick'." Id. at 35, 193 A.2d at 182.

Taylor and Selby appeared before the grand jury but refused to answer certain questions and refused to produce the materials requested by the subpoena, claiming the statutory privilege as the basis for such refusal. When brought before the lower court, Taylor and Selby again refused to an-

swer the questions or produce the materials and were thereupon adjudged in contempt, the court holding that the Act of 1937 protects a newsman only against the compulsory disclosure of the identity of *persons* and does not protect against the compulsory disclosure of documents or other inanimate materials. In its order, the lower court also held:

"(1) that appellants were *not* required to produce an alleged copy of statements made by John Fitzpatrick to the District Attorney's office on February 20, 1962 and set forth in part in The Bulletin on December 30, 1962, since, inter alia, the result might be to disclose the identity of the transmitter of the alleged copy to The Bulletin; (2) that appellants were *not* required to produce memoranda, notes, reports and other documents of or pertaining to investigations conducted by The Bulletin as a result of information furnished by John Fitzpatrick, since such investigations, made on leads furnished by Fitzpatrick, would doubtless encompass confidential interviews with other persons who would give information only if their identity were kept secret; (3) that appellants were *not* required to produce the results of alleged polygraph (liedetector) tests given to Fitzpatrick since, inter alia, this would reveal the identity of the experts who conducted such tests; *but (4) that appellants were required to produce documents and tape recordings allegedly evidencing what John J. Fitzpatrick had told Bulletin reporters, . . .* " Id. at 37-8, 193 A.2d at 183. (Emphasis in original and supplied.)

The lower court directed Taylor and Selby to produce the documents and tape recordings of Fitzpatrick's interview with Bulletin reporters, as,

in its view, the Bulletin had waived the privilege created by the statute by publishing the single sentence quoted, supra: "However, much of the subsequent questioning dealt with what John Fitzpatrick had told Bulletin reporters." The lower court also directed Taylor and Selby to answer certain questions concerning such material.

Taylor and Selby appealed the orders adjudging them in contempt, and as the issues were framed in the Supreme Court, the questions to be answered on appeal were (1) whether Taylor and Selby, without regard to waiver, might have properly exercised the statutory privilege in refusing to produce documents and tape recordings prepared by them evidencing the statements Fitzpatrick made to them, and (2) if they might properly have exercised the privilege, had they nevertheless waived it by publishing the single sentence quoted above?

In an opinion representing the views of six of the seven members of the court, Chief Justice Bell reversed the orders of contempt and at the same time held (1) the word "source" means not only the identity of persons, but also includes documents, inanimate objects and all sources of information; (2) while a news reporter may indeed waive the privilege granted by the act, such waiver extends only to statements of an informant actually published, and the statute must be liberally construed in favor of the news media.

The two-pronged holding of Taylor, when considered in the context of the facts upon which it was based, may be narrowly stated thusly: The word "source," used in the phrase "source of any information" as it appears in the statute, includes, in addition to the identity of persons who are

sources of information, all other sources of information as well, and although the privilege accorded by the statute may be waived, the extent of a waiver is limited to that portion of the source's statement as is actually published.

Plaintiffs here might argue, but wisely decline, that there is a substantive distinction between tapes and documents containing the statements of an animate source, as actually verbalized by such person,[6] and notes and memoranda prepared by a reporter in the course of interviewing an animate source. Certainly, there is some logic in the suggestion that notes made by a reporter during the course of an interview with a disclosed informant, and particularly notes that admittedly do not reveal the identity of undisclosed informants, are not "sources" under the Taylor definition.[7] This suggestion simply equates the word "source" with the word "origin," and adds that even if Taylor permits the nondisclosure of unpublished portions of a disclosed informant's statements, such other information contained in the notes which, by admission, does not reveal the identity of confidential informants, animate or inanimate, is not privileged.

However, we do not read Taylor so narrowly. In the first instance, as the court there noted:

6. Although there is no indication in Taylor that documents "allegedly evidencing what John J. Fitzpatrick had told Bulletin reporters" as ordered to be produced by the lower court contained only the words of Fitzpatrick.

7. One can cite examples of documents more validly characterized as sources than are reporter's notes. For example, the files surreptitiously photographed during the burglary of the office of Dr. Ellsberg's psychiatrist clearly fit the Taylor definition as an inanimate or documentary source. The notes made by a reporter while examining those files would appear to present an issue similar to ours.

"If a Court can select or direct newsmen . . . to select or delete what information is disclosed by the informer . . . the object and the intent of the Act will be *realistically* nullified." Id. at 43-4, 193 A.2d at 186. (Emphasis in original.)

The court appeared to be concerned that the revelation of the questions and answers contained in the undisclosed portion of the Fitzpatrick interview might have also revealed the identity of other sources. Id. at 43-4, 193 A.2d at 186.

Secondly, we must view plaintiffs' request at bar with the precept in mind that Taylor requires a broad and liberal construction of the act, in favor of nondisclosure.

Thirdly, and most obviously, Taylor holds that regardless of the reason, a reporter need not disclose those portions of an informant's statement, whether or not the identity of the informant is disclosed. It is fair to assume that the notes and memoranda prepared by defendants Ecenbarger and Lambert in the course of interviews with informants contain such statements.

It must also be noted that if we apply the principle of statutory construction enunciated in Taylor, *all* notes made by reporters relating to the subjects of articles, regardless of the nature of the contents, are privileged and need not be disclosed or produced. To hold otherwise might well require that we select or delete, or direct newsmen to select or delete, information contained in such notes, the very act on our part effectively prohibited by Taylor.

To hold otherwise would also require a strict and narrow interpretation of the act, directly contrary to the liberal and broad interpretation mandated by Taylor.

Plaintiffs, in recognition of at least the facial authority of Taylor, and the scope of the privilege accorded by the act as apparently including the instant notes, argue that, although the notes here sought may be privileged in another setting, defendants by pleading the defenses of good faith and reliability of source have thereby waived the privilege of nondisclosure of sources. How, ask plaintiffs, rhetorically, can defendants assert as a defense that the sources upon which they relied were reliable, and, at the same time, refuse to reveal the identity of such sources, with the result that reliability or the lack of reliability can never be determined by a fact finder.[8]

While Taylor does not answer the specific question, it does offer some direction. Our interpretation of the holding leads us inevitably to conclude that the privilege as described in Taylor is well nigh absolute and is not waived by the act of pleading the defenses of reliability or good faith. Such an interpretation accords with the broad and liberal construction of the act as required by Taylor.

It may also be argued, although plaintiffs do not, that in Taylor, the court narrowly construed a waiver because of its concern that the identity of undisclosed sources might well have been revealed had the unpublished portion of Fitzpatrick's statement been disclosed: "Judge Kelley based his ruling principally if not solely on his conclusion that the Bulletin had waived the privilege created by the Act of 1937 by publishing in its aforesaid article on December 30, 1962, the single sentence hereinabove quoted: 'However, much of

8. The question, of course, as posed by plaintiffs also focuses upon the historically competing interests of a free press on the one hand and redress for defamation on the other.

the subsequent questioning dealt with what John Fitzpatrick had told Bulletin reporters.' *This obviously gave Fitzpatrick as the leading source, but the identity of many other persons may have been revealed in the questions and/or the answers."* Id. at 43, 193 A.2d at 186. (Emphasis supplied.)

Such concern appears to be at the core of the court's view on the subject of waiver. However, in the face of the clear and succinct holding that follows expression of the court's concern: "We therefore hold that a waiver by a newsman applies only to the statements made by the informer which are actually published or publicly disclosed [footnote omitted] and not to other statements made by the informer to the newspaper." Id. at 44, 193 A.2d at 186, we must assume that the limitation on waiver so expressed applies to unpublished statements regardless of whether other sources might be revealed.

In the alternative, plaintiffs argue that if the privilege facially applies to the notes at bar, and we find no waiver, then this court should carve an exception into the act in the case of libel actions. Unless we do, plaintiffs contend, the act becomes a sword, rather than a shield, to be wielded by and at the whim of unscrupulous newsmen against defamed plaintiffs.

We respond by noting the act itself admits of no exceptions. Were we to create one, we would thereby engraft language onto the act not now apparent. This we may and will not do. Nor does Taylor admit of such an exception. Again, Taylor, at least to us, establishes the privilege against disclosure as absolute. If indeed an exception is to be carved, the blade should be wielded by the tribunal that espoused the principle, and not the trial court.

Plaintiffs argue, to the contrary, that (1) Taylor concerned a grand jury proceeding and not a libel action, and should not, therefore, be applied at bar, as the two proceedings present entirely different considerations; (2) the information sought by plaintiffs goes to the "heart" of their case and should, therefore, be disclosed; and (3) the legislative purpose of the statute creating the privilege would not be served by permitting defendants to avail themselves of its benefits in a libel action.

All such arguments find some support in the cases cited by plaintiffs, and we examine them in moderate detail, discussing plaintiffs' arguments as we do.

Plaintiffs first direct us to three decisions of the appellate courts of New jersey. In the earliest of these, State v. Donovan, 129 N.J.L. 478, 30 A.2d 421 (1943), several public officials contended that indictments returned against them by a grand jury were politically motivated. The Supreme Court of New Jersey appointed a commissioner to investigate the allegation, and in the course of the investigation, the county prosecutor called before the commissioner editors of several Hudson County newspapers who were questioned by the commissioner. One of the questions posed to the editors asked the name of the person who conveyed certain press releases to the editors, the newspapers having published the press releases and the names of the persons who had prepared them. The editors declined to reveal the name of the "conduit," asserting the statutory privilege accorded newsmen in New Jersey. The statute, similar to the Pennsylvania statute, provided:

"No person engaged in, connected with or employed on any newspaper shall be compelled to

disclose, in any legal proceeding or trial, before any court, before any grand jury of any county or any petit jury of any court, before the presiding officer of any tribunal or his agent, or before any committee of the legislature, or elsewhere, *the source of any information* procured or obtained by him and published in the newspaper on which he is engaged, connected with or employed." N.J.S.A. 2: 97-11, as cited in 129 N.J.L. 485. (Emphasis supplied.)

The Supreme Court of New Jersey, in its disposition, noted first that under the law of New Jersey, statutes in derogation of the common law are to be *strictly* construed, and New Jersey courts are not to infer that the legislature intended to alter the common law further than the case requires.

So saying, the court, construing the word "source" as used in the statute strictly, ordered the editors to reveal the name of the conduit through whom the press releases had passed, as such person was not a "source" of information, but merely the messenger who communicated the press releases from the source to the newspaper.

"We conclude that the question did not go to the source of the publication, wherefore the statute does not, in terms, apply . . ." Id. at 487, 30 A.2d at 426.

It is important to note that strict construction of the word "source," and the statute generally, was and continues to be mandated by New Jersey law, as the statute is in derogation of the common law. In contradistinction to that principle, however, the Statutory Construction Act in Pennsylvania provides: "The rule that statutes in derogation of the common law are to be strictly construed, shall have *no* application to the statutes of this Com-

monwelath . . ." Act of November 25, 1970, P.L. 707, added December 6, 1972, P.L. 1339, sec. 3, 1 Pa. C.S.A. §1928(a). (Emphasis supplied.) Accordingly, we are *not persuaded that Donovan supports plaintiffs'* position at bar in any respect.

Following Donovan, the Supreme Court of New Jersey decided Brogan v. Passaic Daily News, 22 N.J. 139, 123 A.2d 473 (1956). In Brogan, plaintiff, a city councilman and candidate for re-election, sued a newspaper for both compensatory and punitive damages as the result of the publication of an allegedly libelous article. The newspaper defended on the basis that: (1) The article was not libelous; (2) the newspaper published the article in good faith and with a reasonable belief in the truth of the article; (3) a retraction had been published; and (4) the article constituted fair comment on the subject and was published without malice.

The trial court ruled that defendant's sources were privileged under the New Jersey statute and, as a result, the jury did not impose punitive damages upon defendant newspaper.

The Supreme Court, reversing, awarded plaintiff a new trial and held that when a newspaper as a defendant in a libel action raises the defenses of fair comment and good faith, and its witnesses testify that its sources were reliable, the newspaper thereby waives the privilege of nondisclosure of sources afforded by the statute and may be properly cross-examined on the subject of such sources. In so holding, the court noted, generally:

"The position of the [reporter-witnesses] in this case is that they insist on asserting these defenses based upon the reliability of the source of information upon which they relied, yet refuse to disclose what those sources were, so that the jury could ascertain whether they were in fact reliable." . . .

"The defendant cannot invoke the statutory privilege to render conclusive their own evaluation of the character and quality of the source. This is basic to due process . . . The statute has no such sweep. It was not designed to reach this situation." Id. at 152, 123 A.2d 480-81.

One can find little fault with the logic implicit in the reasoning of the New Jersey court, adopted and advanced by plaintiffs at bar. Why indeed should a newspaper be permitted to advance as a libel defense the reliability of sources and at the same time refuse to identify such sources? On the Federal level, the problem thus presented has been ably articulated in a recent opinion by Judge Haight, of the United States District Court for the Southern District of New York[9]:

"I conclude that a 'public figure' plaintiff in a defamation action is entitled to liberal interpretation of the rules concerning pre-trial discovery. I intimate no view on the merits of the present case; but one cannot close one's eyes to the possibility of malicious publications or statements concerning public figures. If the malicious publisher is permitted to increase the weight of the injured plaintiff's already heavy burden of proof by a narrow and restricted application of the discovery rules, so that the plaintiff is denied discovery into areas which in the nature of the case lie solely with the defendant, then the law in effect provides an arras behind which malicious publication may go undetected and unpunished. Nothing in the First Amendment requires such a result." Herbert v. Lando, 45 U.S.L.W. 2354 (February 1, 1977) (U.S.D.C. S.D.N.Y., January 4, 1977).

---

9. The case also considers at length the perimeters of pre-trial discovery in civil libel actions under the Federal rules.

In Brogan, the Supreme Court of New Jersey was once again called upon to construe the New Jersey statute according the newsman's privilege, and once again, applying the rule of strict construction of statutes in derogation of the common law, limited the application of the privilege. Again, we are under no such constraint and Taylor obviously adopts the contrary view.

Plaintiffs next point to and rely heavily upon Beecroft v. Point Pleasant Printing & Publishing Co., 82 N.J. Super. 269, 197 A.2d 416 (1964), a case similar on its facts to the matter at hand. Plaintiff, Police Chief of Point Pleasant, N. J., sued for compensatory and punitive damages as the result of an allegedly libelous editorial published in defendant's newspaper. The newspaper defended upon the grounds, inter alia, that the editorial was published in good faith without malice, and that the editorial was within the bounds of fair comment on the subject. The matter before the Superior Court of New Jersey concerned defendant newspaper's motion to strike several of plaintiff's pretrial interrogatories which asked defendant to disclose the facts upon whch the editorial was based, and the identity of the sources of those facts. The newspaper refused disclosure on the basis of the statutory privilege.

The court noted first that the New Jersey legislature, after the decisions in Donovan and Brogan, had amended the statute by expanding the scope of the word "source," presumably to circumvent the Donovan decision, and to include the messenger or means of transmitting the information, but although aware of the decision in Brogan, did nothing to grant relief to newspapers from the mandate of Brogan.

The court next concluded that in its view, the legislative intent underlying the New Jersey statute was a desire only to protect news sources in criminal proceedings such as grand jury investigations. As additional support for such conclusion, the court again noted the New Jersey rule of strict statutory construction and the broad construction accorded the New Jersey rules of pretrial discovery. Id. at 276, 197 A.2d at 419, 420.

Noting finally that a libel action presented considerations "entirely different," the court found the rationale of Brogan controlling, denied the motion to strike plaintiff's interrogatories, and held that by pleading the defenses of good faith, fair comment, truth and lack of malice, a newspaper thereby waives the privilege of nondisclosure of sources accorded by the statute. Id. at 280, 197 A.2d at 421, 422.

It is interesting to note that the version of the statute with which the Superior Court dealt in Beecroft provided that the privilege was considered waived in only two circumstances: When the newsman contracted with anyone not to claim it, and in the event of the voluntary disclosure of, or agreement to disclose, any part of the privileged matter. One may infer from the opinion, then, that the court either did not consider the statutory privilege applicable to discovery proceedings in libel actions, or in the alternative, even if the privilege does apply, a judicially constructed waiver made the privilege unavailable:

"Thus, the voluntary interjection in the present case of the defenses of fair comment, good faith, truth, and lack of malice, while conceivably not within the scope of a waiver as defined by [the

statute], can nevertheless be viewed as an act constituting an effective waiver as such." Id. at 279, 197 A.2d at 421.

Plaintiffs at bar would have us adopt a similar view for the identical reason. We again respond that the rule of statutory construction pertaining in New Jersey is not the rule in Pennsylvania. Not only are we required to interpret and construe statutes liberally, and in a manner that effectuates both the object of the statute and the intention of the legislature, rather than strictly (1 Pa. C.S.A. §§1921(a)-1928(c)), but we must presume that the General Assembly intends to favor the public interest as against any private interest: 1 Pa. C.S.A. §1922(5). The public interest to be served by permitting the free and unfettered news-gathering function of the press, as contrasted with the private interest in obtaining redress for defamation is fully discussed in Taylor and need not be repeated here. However, speaking in the context of a grand jury proceeding, the Supreme Court of Pennsylvania opined in singular language:

"The Act of 1937 is a wise and salutary declaration of public policy whose spiritual father is the revered Constitutionally ordained freedom of the press. The Act must therefore, we repeat, be liberally and broadly construed in order to carry out the clear objective and intent of the Legislature *which has placed the gathering and the protection of the source of news as of greater importance to the public interest and of more value to the public welfare* [footnote omitted] than the disclosure of the alleged crime or the alleged criminal." Id. at 42, 193 A.2d at 185-86. (Emphasis in original.)

And unlike the New Jersey statute, the act in force in Pennsylvania contains no provision regarding waiver of the privilege. In the face of the quotation from Taylor, we cannot, as noted earlier, create one for libel plaintiffs and engraft it upon the act.

Of similar significance, the court in Taylor, it will be recalled, defined the scope of a waiver and limited it to that portion of the statement of an informant actually published or publicly disclosed. Plaintiffs would have us force disclosure of confidential sources and the unpublished statements of informants by finding a waiver as the result of defendants having pleaded good faith and reliability of source.

A similar argument was advanced in In re Bridge, 120 N.J. Super. 460, 295 A.2d 3 (1972). Appealing an order holding him in contempt for refusing to reveal the contents of a statement made to him by a source already disclosed, a news reporter argued that the word "source" as used in the New Jersey statute protected not only the identity of the source of information, but also protected that part of the informant's statement not published.

The Appellate Division of the Superior Court of New Jersey disagreed, finding a waiver by the reporter as the result of publishing the identity of the source and a part of the information imparted by the source. It is instructive to note that New Jersey Evidence Rule 37, relating to waiver and incorporated in the New Jersey privilege statute, provides exactly that:

"A person waives his right or privilege to refuse to disclose . . . a specified matter if he . . . without coercion and with knowledge of his right or

privilege, made disclosure of *any part* of the privileged matter . . ." N.J.S.A. 2A: 84 A-29. (Emphasis supplied.)

Pennsylvania, of course, has no such statute and Taylor holds precisely the contrary.

We finally observe that Taylor was decided on July 15, 1963, and the act itself last amended by the Pennsylvania legislature on July 31, 1968, more than five years following Taylor. The amendment re-enacted the act as originally adopted, adding protection for persons employed by the electronic media and wire services. Although presumably aware of the decision, the legislature again used the words "sources of any information," and no provision regarding waiver was added by the amendment. Section 3 of the Statutory Construction Act, 1 Pa. C.S.A. §1922(4), provides that when a court of last resort has construed the language used in a statute, there is a presumption that the legislature intends the same construction to be placed upon such language as used in subsequent statutes on the same subject. Thus, re-enactment of the identical language by the legislature following the decision in Taylor lends additional weight to the interpretation there placed upon the act by our Supreme Court.

In short, we must also interpret the act broadly and liberally, and in the public interest, and in so doing, do not find that defendants have waived the privilege of nondisclosure by defending the instant action upon the grounds asserted in their answer, or by identifying some of their informants.

Perhaps recognizing the difficulty inherent in the argument that the New Jersey decisions are dispositive of the issue before us, plaintiffs turn to

the Federal jurisdiction and cite for our consideration two cases from the United States Courts of Appeal.

In the first of these, Carey v. Hume, 492 F.2d 631 (D.C. Cir. 1974), pet. dismissed, 417 U.S. 938, 94 S. Ct. 2654, 41 L.Ed. 2d 661 (1974), plaintiff, general counsel for the United Mine Workers of America, brought an action against Jack Anderson and his associate Britt Hume, based upon an allegedly libelous statement published in Anderson's Column, "Washington Merry Go-Round." At pretrial depositions, defendant Hume refused to reveal the names of certain eyewitnesses to an allegedly illegal act committed by plaintiff except to say that such persons were employes of the United Mine Workers of America. Plaintiff moved to compel defendants to reveal the names under Fed. R. Civ. P. 37(a), and the District Court ordered defendants to do so.

Affirming the order of the District Court, the Court of Appeals relied upon Garland v. Torre, infra, and held that the question of compelling the disclosure of the source must be determined on a case-by-case basis, a view expressed by Justice Powell in his concurring opinion in Branzburg v. Hayes, supra:

"The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions." [Footnote omitted] Id. at 710, 92 S. Ct. at 2671.

The Court of Appeals then found that the information sought by plaintiff went to the "heart" of plaintiff's libel action and, striking the balance, ordered disclosure.

The authority of Carey is subject to a three-fold limitation, however, in the context of the case at bar, and by the very opinion of the court that announced it. Firstly, defendant reporters in Carey argued as the only basis for nondisclosure that the First Amendment accorded newspapermen an absolute privilege. Subsequent to the argument but prior to the date of the opinion in Carey, the Supreme Court of the United States announced its decision in Branzburg, supra, holding that the First Amendment accorded newsmen no such absolute privilege.

Secondly, the Court of Appeals noted the limited record upon which it was called upon to act:

"What we have decided — and all that we have decided — is that the District Court cannot, on the limited record before us, be said to have abused the discretion vested in it to grant or deny a motion to compel discovery under Rule 37." Cary v. Hume, 492 F.2d 639.

The court left open the question of how it might have decided the case had the record revealed little or no likelihood of plaintiff's recovery, even with the benefit of the discovery he sought. Cf. Cervantes v. Time, Inc., 464 F.2d 986 (8th Cir. 1972), cert. denied 409 U.S. 1125, 93 S. Ct. 939, 35 L.Ed. 2d 257 (1973), and Ceritto v. Time, Inc., 302 F. Supp. 1071 (U.S.D.C. N.D. Calif. 1969), aff'd per curiam, 449 F.2d 306 (9th Cir. 1971).

Finally, and of particular significance, unlike Pennsylvania, there is no Federal statute conferring a testimonial privilege upon newsmen. Carey

arose in the District Court for the District of Columbia, and the D.C. Code, there controlling, contains no such provision. See Carey, supra, at 636, n. 8. We are at bar dealing with a statute of Pennsylvania and the construction of that statute by the Supreme Court of Pennsylvania, unless and until it is declared to be unconstitutional, is again binding authority upon us. Carey in no way suggests a contrary result and the case must, therefore, be considered inapposite.

Lastly, plaintiffs rely upon Garland v. Torre, 259 F.2d 545 (2d Cir. 1958), cert. denied, 358 U.S. 910, 79 S. Ct. 237, 3 L.Ed. 2d 231 (1958), as authority for their position.

Judy Garland, plaintiff, sued the Columbia Broadcasting System and Herald-Tribune Columnist Marie Torre for libel as the result of allegedly defamatory statements made by an unidentified CBS executive and later published in the New York Herald Tribune under Torre's by-line.

Pretrial, plaintiff deposed Columnist Torre and in the course of the examination, Torre refused to identify her CBS source. Proceedings were commenced in the District Court to compel Torre to identify the source. The District Court directed Torre to disclose the name, and upon her refusal to do so, adjudged her in contempt.

On appeal to the Court of Appeals for the Second Circuit, Torre asserted three alternative arguments: (1) The First Amendment protects absolutely against disclosure of any source; (2) if not, then at least the First Amendment provides a qualified privilege and protects the identity of a confidential source; and (3) regardless of the first two arguments, the District Court abused the discretion granted it under Fed. R. Civ. P. 30 to make

protective orders in that Torre's position as a journalist could be injured from her compulsion to testify, plaintiff might be able to obtain the information elsewhere, and plaintiff's claim was, in any event, of doubtful merit with the result that the information sought would probably prove of no actual use to plaintiff.

Although pre-Branzburg, the Court of Appeals found no absolute privilege against disclosure in the First Amendment[10], found no qualified privilege in the absence of a statute creating one, and quickly disposed of Torre's last argument by finding no abuse of discretion on the part of the District Court in that the information sought by Garland was relevant and material. Torre's conviction of criminal contempt was affirmed.

In dismissing defendant's constitutional claim of privilege, the court noted that the question propounded of Torre "went to the heart of the plaintiff's claim." Id. at 550.

Seizing upon this language, plaintiffs here tell us that the reporters' notes at bar contain information which goes to the heart of their claim, and as in Torre, this court should, regardless of the language of the Pennsylvania statute and Taylor, direct the disclosure of such notes.

It is first observed that at argument, plaintiffs' counsel, responding to a question by the court, asserted that without any of the material sought by them to be produced, plaintiffs' case was of sufficient strength to at least go to the jury. It will also be recalled that since the date of argument, de-

---

10. The court also concluded that freedom of the press, if in fact it *is* embodied in the First Amendment, "must give place under the Constitution to a paramount public interest in the fair administration of justice." Id. at 549.

fendants have provided plaintiffs with additional material. We must, therefore, question plaintiffs' contention that the reporters' notes go to the heart of plaintiffs' claim. Equally significant, we find Garland wholly inapposite to the case before us. Again, no statute of either New York or the Federal jurisdiction conferred a testimonial privilege upon reporters in Garland. Id. at 550. We are here dealing with an act of the legislature of Pennsylvania, but the Garland court was not. We are further confronted by a broad and liberal interpretation of our statute by a State court of last resort. The Garland court labored under no such burden, and was free to cast its holding in the mold it chose: the balance to be struck between the First Amendment freedom of the press and the societal interest in obtaining the testimony of all witnesses.[11] Thus, without regard to whether the notes at bar "go to the heart" of plaintiffs' claim, we are not at liberty to strike the balance in favor of plaintiffs, as it has already been struck for us by the court in Taylor.

Accordingly, as we observed in the case of the New Jersey decisions advanced by plaintiffs, we conclude that the Federal authorities cited by them are not controlling and offer no relief to plaintiffs. Taylor is binding upon us, however, and we find that although it arose in the context of a grand jury proceeding, its holding is sufficiently

---

11. "If an additional First Amendment liberty — the freedom of the press — is here involved, we do not hesitate to conclude that it too must give place under the Constitution to a paramount public interest in the fair administration of justice. 'The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government.' [citation omitted]." Id. at 549.

broad to encompass a civil libel action, and, as so stated, Taylor does not permit us to order production of the notes and memoranda made by reporters Ecenbarger and Lambert in the course of interviews with informants, whether disclosed or not and without regard to whether such notes or memoranda will reveal or lead to the revelation of the identity of confidential informants.

## (2) Production of Other Articles

Plaintiffs also seek production of all articles published in The Philadelphia Inquirer and written by reporters Ecenbarger and Lambert, either individually or jointly with others. Defendants first refuse production on the ground that the articles are irrelevant to plaintiffs' cause, as such request must of necessity seek production of "many articles published by defendant [sic] William Ecenbarger and William Lambert on subjects that have nothing to do with the suit at hand."

Pa. R.C.P. 4009 under which plaintiffs here proceed, permits the inspection of documents subject, inter alia, to the limitations imposed by Rule 4007(a). The latter rule limits discovery to matters "relevant to the subject matter involved in the action."

We observe at the outset that plaintiffs endeavor to place the burden of showing irrelevancy on defendants, citing Kaylor v. Baran, 5 D.&C. 2d 567 (1956), standing as it does for the proposition that when a party objects to discovery on the ground of relevancy, the burden is upon the objector to establish irrelevancy. Defendants, to the contrary, assert that the burden of establishing relevancy is upon plaintiffs and requires in the first instance a showing of relevancy. Cf. Lichtman v. Lipoff, 10 D.&C. 2d 725 (1957).

We think the better view, in a case where the complaint and answer are already before the court as here, should require the court to determine on the basis of the pleadings whether there is any conceivable basis of relevancy, and, if there is, discovery should be permitted: 4 Goodrich-Amram §4007(a)-19, 118. Such view is in accord with the principle that in discovery proceedings doubts as to relevancy should be resolved in favor of relevancy: Eversole v. Dinulos, 13 Lebanon 4 (1970). We must, therefore, determine whether on this record articles written by defendant reporters are, or could conceivably be, relevant to plaintiffs' cause of action.

As former President Judge Davis said in O'Connor v. Fellman, 39 D.&C. 2d 51 (1966):

" . . . the test of relevancy in discovery proceedings under Pa. R.C.P. 4007 is not whether the anticipated answer to the proposed question can immediately qualify as admissible evidence, but whether the proposed question may possibly lead to an answer or answers which, alone or together, may be admissible and possess sufficient probative force to affect a material part of the cause of action." Id. at 54.

And see, to the same effect, Rearick v. Griffith, 27 D.&C. 2d 451 (1962), an able opinion by the late Judge Thomas A. Riley of this court.

Plaintiffs assert that other articles written by defendant reporters are relevant to the defense of good faith, as if defendant PNI intends to claim it relied upon the integrity of its reporters, Ecenbarger and Lambert, such defense might be defeated upon a showing that the reporters had little or no experience or competence in the form of investigative reporting here involved.

We note that defendants' answer to the complaint raises several defenses including constitutional privilege,[12] fair and accurate reports of the activities and conduct of public officials and public figures,[13] fair and accurate reports of judicial, administrative and governmental activities and proceedings,[14] reports of "highly newsworthy matters of substantial public interest and concern,"[15] and reports of matters of public record and thus privileged.[16] Finally, in paragraph 22 of their answer, defendants aver:

12. Paragraph 17 of defendants' answer avers, in its entirety that "[t]he publications complained of are protected speech and privileged under the First and Fourteenth Amendments to the Constitution of the United States and under the laws of the Commonwealth of Pennsylvania." Stripped to the bone, the paragraph appears to aver an absolute privilege. We point out again that there is no absolute privilege, and defamatory publication is not constitutionally protected: Gertz v. Welch, 418 U. S. 323, 341, 346, 41 L. Ed. 2d 789, 806, 809 94 S. Ct. 2997, 3008, 3010.

13. See New York Times v. Sullivan, 789 infra (public official); Curtis Publishing Company v. Butts, 388 U. S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967) (public figure); and Walker v. Associated Press, 388 U. S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967) (public figure), the latter two, extensions of the former.

14. See Cox Broadcasting Corp. v. Cohn, 420 U. S. 469, 43 L. Ed. 2d 328, 95 S. Ct. 1029 (1975).

15. This defense appears to be cast in the mold of Rosenbloom v. Metromedia, Inc., 403 U. S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971). The doctrine set forth in the plurality opinion and the extension of New York Times v. Sullivan there proposed have been thoroughly discredited and effectively overruled, and in the words of Justice Powell, have become "unacceptable": Gertz v. Welch, 418 U. S. at 346, 41 L. Ed. 2d at 809, 94 S. Ct. at 3010; and see Time, Inc. v. Firestone, 424 U. S. 448, 454, 47 L. Ed. 2d 154, 163, 96 S. Ct. 958, 965 (1976).

16. See, again, Gertz v. Welch, supra, and its caveat concerning a publisher's "interpretation" of matters of record.

"22. The publications complained of were written and published based upon reliable sources, in good faith, without malice, on proper occasion and with proper motives, in the belief that the facts set forth therein were true and without any reason to doubt their truth."

The words "good faith" appear only in the quoted paragraph and are the words to which plaintiffs refer.

At bar, plaintiffs' complaint seeks not only actual or compensatory damages, but punitive or exemplary damages as well. The Supreme Court of the United States has held that without regard to whether a plaintiff in a libel action is a public figure or official, an award of punitive or exemplary damages can be constitutionally supported only upon proof that the libel defendant knew the published article was false, or published the article with a reckless disregard of whether the story set forth in the article was false or not: Gertz v. Welch, 418 U. S. at 349, 41 L. Ed. 2d at 810, 94 S. Ct. at 2997 (1974).[17] Such standard has been equated to actual malice and, hence, the rule that punitive or exemplary damages may only be recovered in a libel action against a newspaper upon a showing that the defamatory article was published with actual malice: New York Times Co. v. Sullivan, 376 U. S. 254, 279, 11 L. Ed. 2d 686, 706, 84 S. Ct. 710, 726 (1964).

It is conceivable that an examination of other articles written by defendant reporters may well indicate that the articles at bar represent a first endeavor. We say, without intending to decide the question, that such fact might have imposed some

---

17. Plaintiffs' memorandum of law, p. 8, n. 2 to the contrary notwithstanding.

duty upon PNI not otherwise imposed, and a duty which it failed to perform, and further, that the omission or failure is recklessness of the degree required by New York Times Co. v. Sullivan for the imposition of punitive damages.[18]

We thus conclude that other articles written by reporters Ecenbarger and Lambert are relevant and will substantially aid plaintiffs at trial and should, therefore, be produced for inspection unless some other Rule of Civil Procedure bars production.

Rule 4011(a) prohibits discovery and inspection which is sought in bad faith. Rule 4011(b) prohibits the same when it will cause unreasonable annoyance, embarrassment, expense or oppression to any person or party, and Rule 4011(e) prohibits discovery and inspection which would re-

---

18. See, for example, Cerrito v. Time, Inc., supra, detailing at length the elaborate procedures designed by Life Magazine to enable it to determine whether it might justifiably rely upon the accuracy of articles written by one of its reporters on the subject of organized crime.

In Cerrito, Life commissioned a veteran reporter, thoroughly accredited and recognized as an expert in the field of organized crime, to prepare a series of articles on the subject of organized crime in the United States. As a part of his contract, the reporter asked that he not be required to reveal his sources of information because of the great potential of harm to such sources. Life agreed but by reason of the request and "aware of the developing law, went beyond the normal editorial review of the article," 302 F. Supp. at 1074. In addition to a careful and in-depth review by the editorial staff, Life hired an independent panel of experts to verify the reporter's statements and to then advise Life whether it was justified in relying on the accuracy of such statements.

We do not intend to suggest that PNI should have so acted instantly. We do say, however, that evidence of the procedures followed or not followed by PNI will certainly be admissible at trial as bearing on the issue of recklessness.

quire the making of an unreasonable investigation by, inter alia, any party or witness. Defendants object to plaintiffs' request to inspect all articles written by Ecenbarger and Lambert on these grounds as well.

Defendants ground their "bad faith" objection under Rule 4011(a) upon three bases: (1) The plaintiffs seek irrelevant material and such request, therefore, "could only have been made in bad faith," (2) plaintiffs' request for production was made with the intent to cause defendants unreasonable annoyance, expense and oppression; and (3) production of the articles would require the defendants to make an unreasonable investigation.

As is at once apparent, each of the grounds asserted by the defendants as constituting bad faith is itself a separate basis under Rule 4011 upon which discovery may be prohibited. No other ground upon which we might find bad faith is asserted by defendants. Accordingly, we examine each of the three bases individually, and if none have been established, we may not, on this record, find bad faith.

With respect to the first of these grounds asserted, that of relevancy, defendants are quite correct in their assertion that a request for production of irrelevant material may indeed be an exercise of bad faith in the context of the Rule 4011(a): Fidelity & Deposit Co. of Md. v. Yeo, 12 Bucks 448, 76 York 141 (1962); Pottstown Lincoln-Mercury, Inc. v. Montgomery County Auto Sales, Inc., 2 D.&C. 2d 396 (1954). However, we have already determined that the articles are relevant, and a request for relevant material cannot without more be an exercise in bad faith.

As to the second basis, again defendants correctly state that discovery causing unreasonable annoyance, expense or oppression, or discovery designed to harass may be prohibited under Rule 4011(a), as made in bad faith, as well as being specifically prohibited by Rule 4011(b): 5A Anderson, Pa. Civ. Prac., §4011.11. We should thus decide whether production of the articles at bar will cause defendants unreasonable annoyance, expense and oppression. Unfortunately, we cannot, as defendants have failed to provide us with any facts whatever from which we might find or infer unreasonable annoyance, expense or oppression.

When the moving party has shown a prima facie right to discovery, the party raising an objection under Rule 4011 has the burden of proving that the objection is well founded: White v. Wasco, 57 Luz. 261 (1967); Lichtman v. Lipoff, supra; Lippencott v. Graham, 3 Bucks 16 (1953); Minichino v. Borough of Quakertown, 88 D.&C. 83 (1954); 5A Anderson, Pa. Civ. Prac. §4011.4. Plaintiffs have shown a prima facie right to discovery by seeking relevant material, and defendants have, therefore, clearly failed to carry the burden imposed upon them, as they have not advanced a single reason to support their objection. Excepting the use of the words "multitudes of articles," defendants have merely repeated the language of the rule in framing their objection. Simply because "multitudes" of articles may be involved does not, in and of itself, permit us to determine that production imposes an unreasonable burden. All articles may well be in a single file, for example, easily and quickly available to the defendants.

We may not speculate as to the reasons why production might cause such results to follow, and in

the absence of any facts at all upon which we might make a judgment, the objection cannot prevail.

Lastly, defendants object on the basis that production of the articles will require them to embark upon an unreasonable investigation, and, therefore, the request is again an exercise of bad faith on the part of plaintiffs, in violation of Rule 4011(a) as well as 4011(e).

Again, we should decide whether production would require an unreasonable investigation, but as before, defendants have failed to furnish us with a single fact upon which we might base such decision. Merely showing that production will occasion great investigative effort and expense, without some evidence that the burden so imposed would be unreasonable, is not sufficient to prevail under Rule 4011(e): 5A Anderson, supra, §4011.115. On this record, we are unable to determine whether any investigation is required, let alone an unreasonable investigation. Our discussion of the burden of proof upon the objecting party in connection with Rule 4011(b) is germane to an interpretation of Rule 4011(e). Defendants, again, by failing to provide us with any facts have thus failed to sustain the burden imposed upon them and the objection must be overruled.

Thus, finding the articles sought by plaintiffs to be relevant, and at the same time finding no substance in the objections to discovery interposed by the defendants, we will order the defendants to produce the articles.[19]

19. In the event defendants determine in the course of accumulating the articles that some require an unreasonable investigation or expense, they may at that time present such evidence to the court and seek a protective order.

### (3) *Performance Records*

By paragraph 6 of their motion for production, plaintiffs request all documents in the possession or control of the defendants "concerning the performance of either individual defendant in the course of his employment with Philadelphia Newspapers, Inc." Defendants resist production on the grounds that (1) such records are, again, irrelevant, (2) the request is made in bad faith, and (3) production is burdensome and oppressive, and will cause defendants to make an unreasonable and annoying investigation. In its memorandum of law at pages 15-16, defendants additionally assert that the request for "confidential and highly personal" records is designed to harass and annoy the defendants[20], and that information contained in such records "could not possibly be utilized by plaintiffs" in their endeavor to prove the libelous character of the articles in question.

It was observed that during the course of oral argument, counsel for the parties continued to refer to the documents sought by the plaintiffs as "employment records." As we understand that phrase, it is important to say again that plaintiffs' request is not nearly so broad. Plaintiffs seek only records of the performance of the individual defendant reporters while employed by PNI[21].

For the reasons set forth in our discussion on production of other published articles, we find per-

---

20. One must assume that *all* discovery is to some degree annoying.

21. While plaintiffs might have phrased the request in more explicit language, it may well be that PNI management maintains records of performance ratings of news reporters. At least PNI admits to the possession of such material.

formance records of the individual defendants relevant. Nor can we say that the request for production of such records is subject to limitations of Rule 4011 as advanced by defendants, again for the reasons that defendants have failed to place before us any facts to enable us to determine whether production is burdensome or oppressive, or will cause an unreasonable investigation.

Again we note that PNI may, at trial, defend its position by asserting the reliability of its reporters. Internal records maintained by PNI may serve to cast doubt upon the wisdom or propriety of such reliance. Clearly, the documents are relevant, and most assuredly are they so in the context of pretrial discovery.

Defendants also characterize performance records of defendant reporters as "confidential and highly personal." The records may well be confidential and personal, but so long as they are not privileged they are subject to discovery if they are relevant and will substantially aid in the preparation or trial of the case. Rule 4009 permits the inspection of all tangible things, subject only to the limitations imposed by Rules 4007(a) and 4011. The latter limiting rules do not prohibit discovery of confidential or highly personal documents[22], unless, as noted, such documents are privileged. Defendants cite to us no privilege and we are aware of none. Accordingly, the performance records of the individual defendants, if there are such, should be produced and we will so order.

---

22. Interestingly, defendants do not assert that production of performance records would cause them "unreasonable embarrassment," which *is* a basis for denying discovery and inspection: Rule 4011(b).

## ORDER

And now, to wit, March 16, 1977, defendants are hereby ordered to produce for inspection (1) all articles prepared by William Ecenbarger and William Lambert, individually, jointly or jointly with others and published in the Philadelphia Inquirer, and (2) all records pertaining to the performance of the said William Ecenbarger and William Lambert as news reporters while in the employ of Philadelphia Newspapers, Inc.; plaintiffs' motion for production of notes and memoranda made by the said William Ecenbarger and William Lambert of interviews of informants conducted in the course of preparing the articles which form the basis of the within litigation is hereby denied and dismissed; and except as herein otherwise provided, plaintiffs' motion for production is hereby denied and dismissed.