**COUGHLIN, James and Coughlin, Patricia, his wife, Appellants,**

v.

**WESTINGHOUSE BROADCASTING AND CABLE INC., Appellee.**

**No. 85–1145.**

United States Court of Appeals, Third Circuit.

Argued Oct. 21, 1985.

Decided Dec. 30, 1985.

As Amended Jan. 6 and Jan. 14, 1986.

James E. Beasley, Sarah M. Thompson, William P. Murphy (Argued), Beasley, Hewson, Casey, Colleran, Erbstein & Thistle, Philadelphia, Pa., for appellants.

Jerome J. Shestack (Argued), Carl A. Solano, Robert F. Harchut, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Stephen A. Hildebrandt, Westinghouse Broadcasting and Cable, Inc., Washington, D.C., for appellee.

Before GARTH and BECKER, Circuit Judges and VAN DUSEN, Senior Circuit Judge.

**OPINION OF THE COURT**

PER CURIAM.

Plaintiffs James and Patricia Coughlin filed suit against defendant Westinghouse Broadcasting and Cable, Inc. ("Westinghouse") alleging that Officer Coughlin, a Philadelphia police officer, was defamed by a series of television programs broadcast in February 1982 by KYW–TV, a Philadelphia television station owned and operated by

Westinghouse.[1] According to Coughlin, those broadcasts impliedly accused him of accepting a bribe when it broadcast a clandestine videotape of Coughlin exiting a so-called after hours club with what appeared to be an envelope while on patrol duty. Coughlin also challenged the constitutionality under the state and federal constitutions of the Pennsylvania Shield Law, 42 PA.CONS.STAT.ANN. § 5942(a) (Purdon 1982), which was applied by the district court to preclude plaintiff's discovery of outtakes and source materials used in preparation of the allegedly defamatory broadcasts.

On February 28, 1985, the district court, finding that Coughlin, a public official, had failed to adduce sufficient evidence raising a genuine issue of material fact as to the question of actual malice, granted summary judgment in favor of Westinghouse. The court also denied Coughlin's motion to compel discovery of KYW's news sources and editorial processes involved in making the documentary pursuant to the Pennsylvania Shield Law.

## I.

This action arises out of a television broadcast of "After Hours on American Street," a February 17, 1982 news report prepared by the KYW–TV investigative news unit, the I–Team.[2] The broadcast stemmed from complaints registered by local residents in late 1980 that the Ukranian-American Club, located at 610 American Street in Philadelphia, was a so-called "after hours" club illegally selling liquor to the general public past the 3:00 A.M. closing time mandated by Pennsylvania state liquor law. The investigation conducted by the I–Team was directed to discovering whether citizen complaints that the responsible government authorities—the Philadel-

phia Police Department and the Pennsylvania Liquor Control Board—were not properly enforcing the liquor laws at the club.

From a concealed vantage point, the KYW I–Team filmed activities surrounding the Club on the nights of October 10, 11 and 17, 1981. Plaintiff Coughlin, at the time a rookie patrol officer, was assigned to the midnight to 8:00 A.M. patrol shift for the sector containing the Ukrainian American Club. On the night of October 11, 1981, Coughlin was directed by police radio to conduct a "club check" at the Ukranian Club at approximately 4:05 A.M. At the club, Coughlin was informed that another officer had in fact just been there, and Coughlin then proceeded to leave the club carrying what he claimed was his book of incident report forms in his right hand.

At 7:15 A.M. on the morning of February 10, 1982, while returning home from working the midnight patrol shift, Coughlin was approached by a reporter and cameraman from KYW–TV attempting to question him regarding the events on the night of October 11, 1981. Coughlin requested that no filming take place, asked that the reporter identify himself, and, calling KYW's behaviour "harassment," refused to answer any questions. KYW did not seek another interview with Coughlin. Coughlin, however, was told by his superiors at police headquarters that he was free to talk to the I–Team about this incident if he chose to do so.

When the videotape of Officer Coughlin's October 1981 activities was broadcast by KYW on February 17, 1982, and in follow-up reports on February 18 and 19, 1982, KYW stated that Coughlin was carrying an envelope when he exited the club on October 11, 1981. This interpretation of the incident as revealed on the videotape, combined with other statements in the broad-

---

1. Plaintiff also asserted claims for false light (casting individual in false light), invasion of privacy, and intentional infliction of emotional distress. Mrs. Coughlin alleged loss of consortium. The district court granted summary judgment as to all these additional claims, and the parties have not addressed them separately on appeal.

2. For a more detailed recitation of the relevant facts of this case, see the district court opinion, *Coughlin v. Westinghouse Broadcasting and Cable, Inc.*, 603 F.Supp. 377, 379–80 (E.D.Pa. 1985).

cast concerning possible police corruption surrounding the enforcement of liquor laws at after hours clubs, combined to support Coughlin's charge that the broadcast accused him of taking a bribe.

An internal police investigation of Coughlin's activities failed to result in any charges being filed against him. Police officials testified that they believed Coughlin was carrying a "48" [incident report] book when he left the Club. Subsequent laboratory analysis of the film conducted by the police department and the FBI failed to conclusively establish what Officer Coughlin in fact had in his hand that night.

Applying the rule of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), to this public official libel action, the district court held that Coughlin had the status of a public official; that the broadcast was capable of a defamatory meaning; and that Coughlin had raised a genuine issue of material fact concerning the truth or falsity of those allegedly defamatory statements. *Coughlin*, 603 F.Supp. at 385. As to the issue of actual malice, the district court determined that Coughlin had failed to raise a genuine issue of material fact that KYW broadcast those statements "with knowledge that [the statements were] false or with reckless disregard of whether [they were] false or not." *Id.*, 376 U.S. at 279–80, 84 S.Ct. at 725–26. The court rejected Coughlin's contentions that Westinghouse's alleged hostility towards the Philadelphia police department, reliance on biased sources and failure to investigate constituted sufficient evidence of malice to withstand the defendant's motion for summary judgment. *Coughlin*, 603 F.Supp. at 386.

II.

■ We likewise reject Coughlin's contentions. We do so substantially for the reasons so well expressed in Chief Judge Luongo's thoughtful district court opinion. *Coughlin v. Westinghouse Broadcasting and Cable, Inc.*, 603 F.Supp. 377 (E.D.Pa. 1985). Accordingly, we hold that the district court correctly determined that Coughlin was a public official, and correctly concluded as well that Coughlin failed to raise a genuine issue of material fact as to the issue of actual malice.

■ With respect to the constitutional issue raised by Coughlin as to the Pennsylvania Shield Law, 42 PA.CONS.STAT. ANN. § 5942(a) (Purdon 1982),[3] we recognize this issue was not presented as forcefully as the issue of actual malice under *New York Times*. However, pursuant to our request at oral argument, the parties submitted more extensive briefs directed to the question of the constitutionality of invoking the Pennsylvania Shield Law to preclude discovery of a reporter's notes and sources by a plaintiff in a public official libel action. Upon review of their submissions, we are satisfied that the Pennsylvania Shield Law, as applied to public official libel actions, suffers from no state or federal constitutional infirmity. Specifically, we hold that the Shield law does not abridge any rights guaranteed by Article I, Sections 1, 7 or 11 of the Constitution of the Commonwealth of Pennsylvania. Nor does it result in a denial of due process in violation of the fourteenth amendment to the United States Constitution.[4]

3. The Pennsylvania Shield Law, 42 PA.CONS. STAT.ANN. § 5942(a) (Purdon 1982) provides:

**§ 5942. Confidential communications to news reporters**

(a) **General rule.**—No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any magazine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.

4. Article 1, Section 1 of the Pennsylvania Constitution provides:

**Section 1. Inherent rights of mankind**

All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

Article 1, Section 7 provides:

Accordingly, we affirm the district court's order of February 28, 1985 which granted Westinghouse's motion for summary judgment.

Each party will bear its own costs.

BECKER, Circuit Judge, concurring:

Although I believe that Officer Coughlin has been defamed, I cannot fault the majority's conclusion that plaintiffs have not adduced evidence of malice or reckless disregard sufficient to meet the rigorous *New York Times* standard. Hence, I agree with the majority's conclusion that the district court did not err in granting summary judgment on the merits. What for me are the close and difficult questions in this case are whether the Pennsylvania Shield Law violates the Pennsylvania Constitution or the federal Constitution. These questions are essential to the outcome of the case because the Shield Law operates to choke off sources from which Coughlin might have proved actual malice or reckless disregard.

The majority states that the Shield Law survives both constitutional challenges. I agree. The majority does not state its reasoning on the crucial constitutional questions, however, so I cannot be sure of the foundation of our agreement. I believe that these questions are of sufficient complexity and importance that they deserve full analysis. The Pennsylvania constitutional questions have rarely been considered in the case law, never in depth. The federal constitutional question, although the subject of more litigation, presents difficult and complex issues that should not be dealt with summarily. I therefore write separately to explore the relevant history and to articulate the arguments and reasoning involved in these difficult questions.[1]

## I. *THE PENNSYLVANIA SHIELD LAW*

The Pennsylvania Shield Law, 42 Pa. Cons.Stat.Ann. § 5942(a) (Purdon 1982) provides, in relevant part:

*General Rule:* No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any magazine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.

The Pennsylvania courts have repeatedly emphasized the important interests served by the Shield Law, and have held that it is to be broadly construed. In *In re Taylor*, 412 Pa. 32, 193 A.2d 181 (1963), for example, the Supreme Court of Pennsylvania stated that the Shield Law was to be "liberally construed in favor of the newspapers

**Sec. 7. Freedom of press and speech; libels**

The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all indictments for libels the jury shall have

the right to determine the law and the facts, under the direction of the court, as in other cases.

Article 1, Section 11 provides:

**Sec. 11. Courts to be open; suits against the Commonwealth**

All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

1. I wish to acknowledge at the outset the excellent and comprehensive briefs filed by both parties. They made the difficult analyses much easier.

and news media," *id.* at 40, 193 A.2d at 185, and it emphasized that the Shield Law served a vital public function:

> [I]mportant information, tips and leads will dry up and the public will often be deprived of the knowledge of dereliction of public duty, bribery, corruption, conspiracy, and other crimes committed or possibly committed by public officials or by powerful individuals or organizations, unless newsmen are able to *fully and completely* protect the sources of their information. It is vitally important that this public shield against government inefficiency, corruption and crime be preserved against piercing and erosion.

*Id.* The Court held that the Shield Law protected any documents that might provide evidence of a reporter's news sources. *Id.* 193 A.2d at 184–85. *See also Hepps v. Philadelphia Newspapers, Inc.*, 506 Pa. 304, 327–28, 485 A.2d 374, 387 (1984) (reaffirming *Taylor* and emphasizing the breadth of the Shield Law), *prob. jur. noted*, — U.S. —, 105 S.Ct. 3496, 87 L.Ed.2d 628 (1985). This court has held that the Shield Law even protects "outtakes," *i.e.*, filmed or recorded material not included in the broadcast, because the outtakes might reveal news sources. *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 277–78 (3d Cir.1980).

## II. *THE PLAINTIFFS' DISCOVERY REQUESTS*

Plaintiffs moved for discovery of (1) defendant's outtakes; (2) facts supporting

statements made in the broadcast and the sources of those facts; (3) records or evidence of the defendant's efforts to verify its information; (4) the defendant's editorial processes as to each statement; and (5) the names of the defendant's allegedly confidential sources. *Coughlin v. Westinghouse Broadcasting and Cable*, 603 F.Supp. 377, 380 (E.D.Pa.1985). The district court ruled that each of these requests was barred by the Shield Law, *id.* at 380 n. 2, and that the Shield Law violated neither the state nor the federal constitutions, *id.* at 381–83. The court relied on *Samuelson v. Susen*, 576 F.2d 546 (3d Cir.1978), although that case was concerned solely with Ohio law, and on *Rosen v. N.L.R.B.*, 735 F.2d 564 (D.C.Cir.1984), which dealt with a federal due process challenge to the application of the attorney-client privilege in a particular case. 603 F.Supp. at 382. The court also explained that it was reluctant to "second guess the state's policy decisions," *id.* at 383, embodied in the Shield Law.

The plaintiffs do not dispute that the Shield Law applies to all of the information sought. Therefore, although I have some doubts that the Shield Law does extend so far,[2] I will assume this to be true. The plaintiffs appeal the district court's rulings about the state and federal constitutionality of the Shield Law, arguing that the Shield Law violates art. 1 § 1 and art. 1 § 7, of the Pennsylvania Constitution,[3] as

---

**2.** The Shield Law protects only sources of information, not the thought or editorial processes of reporters or news organizations. Neither plaintiffs' third nor fourth requests—evidence of defendant's efforts to verify its information and the editorial process of each statement—would necessarily disclose any information about the defendant's sources. The distinction between source information and information about editorial processes is well-recognized. *See, e.g.*, Note, *Source Protection in Libel Suits after Herbert v. Lando*, 81 Colum.L.Rev. 338, 359 (1981).

**3.** Plaintiffs raise one other state constitutional issue, whether the Shield Law violates art. I, § 11 which states, in relevant part, that "[a]ll courts shall be open; and every man for an injury done him in his ... reputation shall have remedy by due course of law." Plaintiffs argue that this section guarantees them a cause of

action for damage to reputation and that the Shield Law effectively abridges that right of action.

Leaving aside whether it may accurately be said that the Shield Law actually abridges a cause of action, or merely makes it more difficult to prosecute such an action, *see infra* pp. 21, 28 & n. 16, I believe that this argument rests upon a misreading of art. I, § 11. That section was aimed at corrupt judges and court officers who extorted money for hearing cases, *see* C.R. Buckalew, An Examination of the Constitution of Pennsylvania 17–18 (1883); T.R. White, Commentaries on the Constitution of Pennsylvania 159–60 (1907), and was intended only to guarantee equal access for all litigants. It was not meant to enshrine any causes of action in the state constitution. *Cf. McCollum v. Birmingham Post Co.*, 259 Ala. 88, 65 So.2d 689 (1953)

well as the due process clause of the fourteenth amendment. I consider each of these contentions in turn.

### III.   *ARTICLE I, SECTION 1*

Pennsylvania Constitution art. I, § 1 owes its origin to the Constitution of 1790, where it appeared as Article IX, section 1. *The Proceedings Relative to Calling the Conventions of 1776 and 1790* at 161 (John S. Wrestling, Harrisburg, 1825) (referred to hereinafter as *"Proceedings "*). It states:

> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property *and reputation,* and of pursuing their own happiness.

(emphasis supplied). Except for being shifted to a more prominent place within the Constitution, the provision has remained unchanged since 1790.

The inclusion of reputation among the short list of "inherent and indefeasible" rights marked a departure from the then-prevailing Constitution of 1776 which had referred to the rights of "enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining happiness and safety." Ch. I § 1.   *See Proceedings* at 55. Indeed, most similar documents of the day did not elevate reputation to the pantheon of inalienable rights. *See, e.g.,* Virginia Bill of Rights, of June 12, 1776 (*reprinted in* H.S. Commager, *Documents of American History* 103 (9th ed. 1973)); Declaration of Independence (*reprinted in* Commager at 100) (referring to "Life, Liberty, and the pursuit of Happiness"); The Declarations and Resolves of the First Continental Congress, October 14, 1774 (*reprinted in* Commager at 83) (referring to "life, liberty, and property"). The Pennsylvania Constitution was one of the few that expanded the list. *Cf.* Article XI Massachusetts Bill of Rights of 1780 (*reprinted in* Commager at 107) (guaranteeing remedies for wrongs to "person, property, or character"). Pennsylvania's departure seems to have been prompted in part by the controversial case of *Respublica v. Oswald,* 1 Dall. 319, 1 L.Ed. 155 (Pa.1788), which involved alleged libel by the press.[4]   In addition, the proper balance between a free press and the protection of reputation was the subject of debate and litigation throughout the young nation. We can be confident that the inclusion of reputation in the Constitution was thoroughly discussed.

Given this background, we may assume that the inclusion of reputation in the Constitution was not merely rhetorical or lightly considered.   It reflected a considered choice that we must respect.   *Cf. Commonwealth v. Swallow,* 8 Pa.Super. 539, 603 (1898) ("Among the rights declared by the constitutions of 1790, 1838, and 1873 to be 'inherent and indefensible' is that of protecting reputation").   Reputation was put on the same constitutional footing as life, liberty, and property, *Meas v. Johnson,* 185 Pa. 12, 19, 39 A. 562, 563 (1898), and it is therefore undeniable that the Pennsylvania Constitution creates a right in reputation which the judiciary is bound to protect.[5]

(interpreting a substantially similar clause of the Alabama Constitution in the same way). The Pennsylvania Supreme Court has at least twice expressly rejected the argument that art. 1 § 11 limits the power of the legislature to create, abolish, or limit causes of action. *Freezer Storage, Inc., v. Armstrong Cork, Inc.,* 476 Pa. 270, 281, 382 A.2d 715, 721 (1978); *Singer v. Sheppard,* 464 Pa. 387, 399, 346 A.2d 897, 903 (1975).

**4.** Oswald, a newspaper publisher, was arrested for libel.   After his release on bail, he published an article accusing several members of the state Supreme Court of bias.   He was cited for contempt of court.   The Supreme Court upheld the contempt charge, rejecting Oswald's argument that freedom of the press guaranteed him immunity.   Both Chief Justice McKean, who sat on the case, and William Lewis, who prosecuted Oswald's contempt citation, were delegates to the Convention of 1790.   R.L. Brunhouse, *The Counter-Revolution in Pennsylvania, 1776–1790* 225 (1942).

**5.** I thus reject defendant's attempt to diminish the significance of the right to reputation.   Neither the fact that Blackstone may have considered reputation less significant than other rights, *see* 1 W. Blackstone, Commentaries *122,

Plaintiffs argue that the Shield Law makes it so difficult to prosecute a defamation or libel action that their right of reputation is effectively denied. The argument has force: libel suits and defamation suits are the only ways private individuals can protect their reputation rights against infringement by a powerful media, and the Shield Law in conjunction with the "actual malice" standard imposed by *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) makes successful prosecution of libel and defamation suits exceedingly difficult for public figures.[6] Nevertheless, for the reasons stated below, I feel that the argument must ultimately fail.

Pennsylvania courts have held that the right to reputation, although undeniably enshrined in the Constitution, is not inviolable. Like other property rights with constitutional "guarantees," the right to reputation may suffer on account of a public policy or need for some other good. *See, e.g., Matson v. Margiotti,* 371 Pa. 188, 88 A.2d 892 (1952); *Commonwealth v. Murphy,* 8 C.C. 399, 405 (1890) ("Just as private property may be taken by the state for the public benefit, so a man's character and reputation may be made to suffer for the public good."). When confronted with a choice between the right to reputation on the one hand, and public policy as expressed by an enactment of the state legislature on the other, a court is forced to balance the two considerations. Because

this is purely a matter of state law, we must balance as we believe the state supreme court would.

We are faced with the initial problem that the Pennsylvania courts have not articulated a clear standard for the balance. Does legislation that infringes upon the right to reputation have to be the "least restrictive" alternative, that is, must it infringe on the right to reputation only as much as necessary to accomplish its goals? Or, does the legislation have to be only "reasonably related" to its goals to pass state constitutional muster?[7] We simply do not know.

Despite this problem, I think that we can reach an answer (and need not abstain, *see Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941)), because there have been several cases which, although not directly on point, are sufficiently similar as to be strongly suggestive that the Pennsylvania courts would uphold the Shield Law against this constitutional challenge. First among these cases is *Matson v. Margiotti, supra,* in which the Pennsylvania Supreme Court upheld the absolute immunity of the State Attorney General as a defense against a charge of libel. The Court reasoned that the plaintiff's interest in reputation notwithstanding, the goals served by the common law right of absolute immunity outweighed competing considerations.[8]

---

nor the fact that constitutional conventions after 1790 debated the need to balance the right to reputation against the right of free expression, *see, e.g.,* 5 Debates of the Convention to Amend the Constitution of Pennsylvania 589 (1873); 12 Proceedings and Debates of the Pennsylvania Convention, 1837–38 4–9 (1838), diminishes the importance of the right to reputation. Our interpretation of the Constitution should not be controlled by Blackstone. Subsequent debates are informative, but the fact that defendant points to no changes in art. 1, § 1 on account of the debates leaves me unconvinced that the debates diminish the force of that section.

6. A long line of cases demonstrates that police officers are public figures, *see, e.g., Time Inc. v. Pape,* 401 U.S. 279, 284, 91 S.Ct. 633, 636, 28 L.Ed.2d 45 (1971); *St. Amant v. Thompson,* 390 U.S. 727, 739, 88 S.Ct. 1323, 1327, 20 L.Ed.2d

262 (1968); *Henry v. Collins,* 380 U.S. 356, 357, 85 S.Ct. 992, 993, 13 L.Ed.2d 892 (1965), and that point is not disputed here.

7. These are, of course, the tests often used in the federal due process and equal protection areas, but there is no reason that the Pennsylvania courts must be limited to these and cannot develop other standards for the interpretation of their own statute.

8. The Court said:
    [N]either freedom of speech nor freedom to protect one's property and reputation—each of which is guaranteed by the [Pennsylvania] Constitution—is unlimited, and it is obvious that they must sometimes be competing and conflicting.... Even though the innocent may sometimes suffer irreparable damage, it

*Matson* demonstrates that the right to reputation may be overridden by a claim of privilege if the public interest so requires.

More recent cases such as *In re Taylor*, 412 Pa. at 32, 193 A.2d at 181, and *Hepps*, *supra*, 506 Pa. at 304, 485 A.2d at 374, although not explicitly concerned with the right of reputation, insist upon the value of the Shield Law to the functioning of the government. *Taylor* emphasized the institutional role of the press in a democratic government. *Hepps*, although less explicit than *Taylor* on this point, reaffirmed the breadth of the Shield Law's coverage. Since *Taylor* had extended the Shield Law's breadth on account of its crucial institutional role, it is reasonable to read into *Hepps'* holding a similar statement about the importance of the Shield Law for press and society.

*Commonwealth v. Tate*, 495 Pa. 158, 432 A.2d 1382 (1981), although not involving the Shield Law, provides further support for this position. The issue in *Tate* was whether people distributing leaflets on a college campus could be convicted of criminal trespass. The court framed the issue as a clash between the defendant's right to freedom of expression and the college's right to control activities on its own property. Balancing the two rights, the court held that the right to expression must prevail on account of the "invaluable" nature of free speech. *Id.* at 175, 432 A.2d at 1391. Admittedly, the factual circumstances of *Tate* are very different from those of this case, but the essential issue in the two cases is the reconciliation of the freedom of expression of some and the property rights of others. The *Tate* decision demonstrates again the extremely high value the Penn-sylvania Supreme Court places on free speech.

While the question is close, these cases suggest that the Pennsylvania Supreme Court has historically placed such importance on free speech in general, and on the Shield Law in particular, that it would uphold its constitutionality today against the art. 1, § 1 challenge despite the consequent cost to the right of reputation. Perhaps the Pennsylvania courts, which are the authoritative interpreters of the Pennsylvania Constitution, will view the matter differently. Perhaps they will impose a "least restrictive alternative" analysis, or strike a somewhat different balance that will give libel plaintiffs a better chance of success.[9] As a federal judge I am more constrained, and seeing no clear way to narrow the Shield Law without emasculating it, *see* discussion *infra* at 349, I would leave any such exercise to the state courts if they are so disposed.

## IV. *ARTICLE I, SECTION 7*

Plaintiffs' second argument relies on Pa. Const. art. I § 7:

> The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write, print on any subject, *being responsible for the abuse of that liberty....*

(emphasis supplied). The restraint on the press imposed by the requirement that the press be responsible for abuses of its liber-

---

has been found to be in the public interest and therefore sounder and wiser public policy to "immunize" public officials [from liability for defamation]. 371 Pa. at 202–03, 88 A.2d at 899. It is worthy of note that the official immunity at issue in *Matson* was part of the common law, and thus lacked the statutory authority of the reporters' privilege at issue here. It is also significant that whereas *Matson* suggested that libel suits against certain officers of the state might be completely barred, the Shield Law does not create a bar to suits, but merely restricts the evidence that may be used in such suits.

**9.** I note, however, that any finely tuned balancing may have to await the United States Supreme Court's decision in *Hepps*, 506 Pa. 304, 485 A.2d 374 (1984), *prob. jur. noted,* — U.S. ——, 105 S.Ct. 3496, 87 L.Ed.2d 628 (1985), and *Liberty Lobby Inc. v. Anderson*, 746 F.2d 1563 (D.C.Cir.1984), *cert. granted,* — U.S. ——, 105 S.Ct. 2672, 86 L.Ed.2d 691 (1985). *See infra* n. 17.

ty entered the Constitution in 1790, a product of the same conservative forces mentioned in the discussion of art. I § 1. *See supra* Part III. The Constitution of 1776, by contrast, had no such restraints, focusing exclusively on the value of an unfettered press. Chapter I, section 12 of the Constitution of 1776, for example, said:

> [T]he people have a right to freedom of speech, and of writing and publishing their sentiments; therefore the freedom of the press ought not to be restrained.

Quoted at *Proceedings* at 56. Elsewhere the Constitution of 1776 stated:

> The printing presses shall be free to every person, who undertakes to examine the proceedings of the legislature, or any part of government.

Chapter II, section 35, quoted in *Proceedings* at 63. The earlier Constitution was thus clearly more concerned with preventing limitations on the press than with curbing potential abuses by the press. The Constitution of 1790, by contrast, evidences a significant concern with press abuses. The Superior Court of Pennsylvania has recently described the shift from the 1776 Constitution to the 1790 Constitution:

> The apparent absoluteness of the 1776 guarantee of freedom of expression and its capability for abuse gave rise to an exemption from its protection, for it soon became clear, that although the freedom of *expression* is arguably an absolute right, the right to *protection from prosecution for abuse of freedom* is a limited one.

*Long v. 130 Market Street Gift and Novelty of Johnstown,* 294 Pa.Super. 383, 398, 440 A.2d 517, 525 (1982).[10]

Plaintiffs' argument, simply stated, is that the Shield Law makes it virtually impossible for plaintiffs to succeed in a libel suit against the television station; that libel suits are the principle guarantors that the press be responsible for its abuse of liberty; and, thus, that the Shield Law effectively absolves the defendant of all re-

sponsibility for the abuse of its liberty, in violation of art. I § 7. I cannot accept this argument for two reasons. First, it requires an unjustifiably broad reading of art. I, § 7. On its face, that section would require only that the press not be absolutely immune from libel and defamation actions. Clearly, the Shield Law would not violate this reading of art. I, § 7. Plaintiffs, however, would have us read that section as guaranteeing not only that the press is not immune but also that plaintiffs have certain rights of access to press documents in libel and defamation actions. Plaintiffs can point to no elements of the legislative history of the provision that would justify this reading, however, and it is doubtful that the authors of 1790 had in mind such a right of access.

I am encouraged in this reading by the very similar case of *Maressa v. New Jersey Monthly,* 89 N.J. 176, 445 A.2d 376 (1982). In that case, the New Jersey Supreme Court considered a plaintiff's claim that the New Jersey Shield Law, N.J.Stat.Ann. § 2A:84A–21 (West Supp.1985), violated a state constitutional provision that "[e]very person may freely speak, write, and publish his sentiments on all subjects, *being responsible for the abuse of that right.*" N.J. Const. art. 1, ¶ 6 (emphasis supplied). The Court rejected the plaintiff's argument, drawing the same distinction that we draw here; the Court interpreted the constitutional provision as merely precluding absolute immunity from libel actions, not requiring that all libel actions be unrestricted:

> The entire thrust of Art. 1, ¶ 6 is protection of speech. The framers, however, did not want that protection to be absolute. Specifically, they did not view the existence of a libel action as inimical to free speech. They therefore inserted a clause to insure that the broad speech protection they were providing would not be construed to preclude libel suits.

---

**10.** The Pennsylvania Supreme Court took an especially long historical view of art. I, § 7 in *Goldman Theaters v. Dana,* 405 Pa. 83, 88, 173

A.2d 59, 62, *cert. denied,* 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1962), tracing its roots back to Blackstone.

This is all that the clause means. We do not believe that it was intended to create a right to sue for damages in libel. Had the framers intended such a right, they surely would have expressed that intent more directly.

Id. at 192, 445 A.2d at 385. *But see id.* at 202–03, 445 A.2d at 392–93 (Schreiber, J., dissenting) (arguing that New Jersey's Shield Law did violate that portion of the state's constitution). This reasoning is equally applicable to the Pennsylvania Constitution, art. I, § 7.

The second reason we reject plaintiffs' argument under art. I, § 7, is that although the Shield Law affects the *manner* in which plaintiffs may develop evidence to support his defamation claim, it does not make successful defamation claims impossible. Plaintiff may use other evidence, both direct and circumstantial, to substantiate his claim. Admittedly, the plaintiffs' case is made much more difficult by the Shield Law, but that reflects a choice by the state legislature that it is not within our power to upset.

## V.  *PLAINTIFFS' DUE PROCESS CLAIM*

Plaintiffs argue that the Shield Law in conjunction with the heavy burden of proof imposed upon them by *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) makes it virtually impossible for them to protect their reputations by pursuing their libel claim. Because they have a property interest in reputation, *see* Pa. Const. art. I, § 1; *supra* Part III,

plaintiffs claim that they are denied due process.[11]

It is hard not to sympathize with plaintiffs. The *New York Times* standard makes it hard enough for a public figure to win a libel suit, even when faced, as here, with what any fair observer must agree is egregious conduct on the part of the media. The Shield Law makes it more difficult still.[12] Nevertheless, I am constrained by the decisions of the Supreme Court in this area, and persuaded by the reasoning of sister courts in similar cases, to find that the plaintiffs' argument must fail. Because neither the district court nor the majority of this panel discussed this issue in detail, I find it necessary to explore the background of reporters' privileges and shield laws.

### A.  *Reporters' Common Law Privileges*

My analysis begins with the seminal case of *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) in which three reporters, subpoenaed to appear before grand juries to divulge the names of certain of their informants, challenged the subpoenas on first amendment grounds. The reporters argued that they had promised confidentiality to their sources, and that they had a first amendment right to protect the confidentiality of their sources. By a vote of 5–4, with a plurality opinion by Justice White and a concurring opinion by Justice Powell, the Court held that although the journalists' cultivation of confidential news sources was a part of newsgathering that deserved first amendment protection,[13] society's "fundamental" inter-

---

**11.** It is important to note that my conclusion that the Shield Law does not violate the Pennsylvania Constitution does not preclude the possibility that the Shield Law violates the due process clause. The questions asked and issues raised in the two inquiries may be similar, *see supra* n. 7; however, the standards that we use to evaluate the two questions may be different. The state courts might mandate a less demanding test or the state courts might focus on different factors than do the federal courts in due process cases. Either way, the state constitutional analysis concluding that the Shield Law passes state constitutional muster would not preclude a federal due process analysis.

**12.** Other courts and scholars have noted the difficult position of public figures confronted with claims of reporters' privilege. *See, e.g., Carey v. Hume,* 492 F.2d 631, 634 (D.C.Cir.1974), *cert. dismissed,* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974); *id.* at 640 (MacKinnon, J., concurring); *DeRoburt v. Gannett Co., Inc.,* 507 F.Supp. 880, 884 (D.Hawaii 1980). *See also* Sack, *Special Discovery Problems in Media Cases* 6 Litigation 21, 22–23 (1980).

**13.** All of the justices acknowledged that the confidentiality of sources did have a basis in the first amendment. *See* 408 U.S. at 681, 92 S.Ct. at 2656 (opinion of White J., joined by Black-

est in law enforcement overrode the first amendment interests at stake.

In the wake of *Branzburg*, courts faced with assertions of reporters' privileges have proceeded on a case-by-case basis,[14] balancing the reporters' rights against the interests of those seeking information. *United States v. Criden*, 633 F.2d 346 (3d Cir.1980), *cert. denied*, 449 U.S. 113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981); *United States v. Cuthbertson*, 630 F.2d 139 (3d Cir.), *cert. denied* sub nom. *Cuthbertson v. C.B.S. Inc.*, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); *Miller v. Transamerica Press, Inc.*, 621 F.2d 721, 726, *on rehearing* 628 F.2d 932 (5th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981); *Palandjian v. Pahlavi*, 103 F.R.D. 410 (D.D.C.1984); *Continental Cablevision v. Storer Broadcasting*, 583 F.Supp. 427 (E.D.Mo.1984). As a result of their case-by-case analyses, the courts eventually fashioned a three-step test, first articulated in *Garland v. Torre*, 259 F.2d 545 (2d Cir.), *cert. denied*, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958), for resolving the privilege cases: the reporter's privilege is overridden only if (a) the information sought is relevant, (b) it cannot be obtained by alternative means, and (c) there is a compelling interest in the information. *See, e.g., Criden, supra; Cuthbertson, supra; Miller, supra; Continental Cablevision, supra.*

## B. *The Statutory Privilege*

The situation in this case differs from that in the cases just cited, for here we have a shield law, a statutory privilege, whereas those cases involved the constitutional, common law privilege. Although there was no statutory privilege at issue in *Branzburg*, the Court there considered how such a law might have affected its analysis:

> There is ... merit in leaving state legislatures free, within First Amendment limits, to fashion their own standards in light of the conditions and problems with respect to their relations between law enforcement officials and press in their own areas. *It goes without saying, of course, that we are powerless to bar state courts from responding in their own way and construing their own constitutions so as to recognize a newsman's privilege, either qualified or absolute.*

408 U.S. at 706, 92 S.Ct. at 2669 (emphasis supplied). Following *Branzburg*, courts insisted that state shield laws deserve great deference and are virtually immune from judicial scrutiny. In *Fischer v. McGowan*, 585 F.Supp. 978, 988 (D.R.I.1984), for example, the court said:

> [T]his court (whether or not sympathetic to the predicament of the parties) has no choice but to effectuate the balance struck by the Rhode Island General Assembly and to follow exactly the letter of a well-drawn legislative enactment.

(footnote omitted). In *Maressa*, 89 N.J. at 201–02, 445 A.2d at 389–90, the court took a similar position: "[T]he Legislature has weighed the competing interests in a free press and the individual interest in reputation. It has chosen to give greater protection to freedom of speech, and our duty is to enforce that choice." (footnote omitted).

It would appear that the Supreme Court's strong dictum in *Branzburg* and the persuasive precedent of *Fischer* and *Maressa* would control this case and make

---

mun, Rehnquist, JJ., and Burger, C.J.) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated."); *id* at 709, 92 S.Ct. at 2670 (Powell, J., concurring) ("The Court does not hold that newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of news or in safeguarding their sources."); *id.* at 712, 92 S.Ct. at 2671 (Douglas, J., dissenting) ("[T]he First Amendment protects [a reporter] against an appearance before a grand jury."); *id.* at 725, 92 S.Ct. at 2671 (Stew-

art, J., dissenting, joined by Brennan and Marshall, JJ.) ("The reporter's constitutional right to a confidential relationship with his source stems from the broad societal interest in a full and free flow of information to the public.").

**14.** Justice Powell's concurrence in *Branzburg* had suggested that this was precisely the course that the lower courts should take. 408 U.S. at 710, 92 S.Ct. at 2671.

our ruling in favor of the defendants quite obvious. This appears to have been the position of the district court which refused to "second guess the state's policy decisions." *Coughlin*, 603 F.Supp. at 383. Our case is different from *Fischer* and *Maressa*, however, for in those cases the parties seeking to overcome the reporters' privileges did not assert federal constitutional rights; here, by contrast, plaintiff makes a due process argument. Whereas courts may defer to legislatures when parties make policy arguments in favor of overturning reporters' statutory privileges, courts cannot defer to the judgment of legislatures when the party seeking to overcome the privilege himself asserts a constitutional right. A legislative preference cannot limit a constitutional right.

### C. *The Relevance of Mathews v. Eldridge*

Once it is recognized that deference to the state's policy determination embodied in the Shield Law is inappropriate on account of plaintiffs' due process claim, it seems clear that a *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) balancing test is appropriate. Admittedly, this is not the standard setting for the balancing test, but a brief analysis of the situation reveals that it is structurally identical to the more familiar domains of the *Mathews* test: plaintiffs have an undeniable property interest in reputation, *see supra*, Part III, and the question is whether the Shield Law renders their judicial recourse so difficult as to be meaningless and thus a denial of due process. The question, that is, is how much process is due.

*Mathews* warned that due process " 'is not a technical conception with a fixed content unrelated to time, place and circumstance,' " 424 U.S. at 334, 96 S.Ct. at 902 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961)), and gave three factors for a court to consider in determining whether a party had been given sufficient process:

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official actions; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Id.* at 335, 96 S.Ct. at 903.

Here, the private interest at stake is clear and significant—Officer Coughlin's reputation. Not only is reputation protected by the state constitution, but it has deep, philosophical foundations: the high value we place on reputation "reflects no more than our basic concept of the essential dignity and worth of every human being." *Rosenblatt v. Baer*, 383 U.S. 75, 92, 86 S.Ct. 669, 679, 15 L.Ed.2d 597 (1966) (Stewart, J., concurring). Furthermore, the Shield Law clearly increases the chances that plaintiffs will be erroneously deprived of their property interests: as noted above, the Shield Law makes it significantly more difficult for plaintiffs to prove actual malice than it would be without the Shield Law.

Weighed against these considerable interests are the state's interest in maintaining a free and uninhibited press and the vital role that the Shield Law plays in maintaining that free press. I have already referred to cases in the state courts that have spoken of the crucial structural role played by the press and the Shield Law. The significance of the Shield Law is attested to by the fact that at least 26 states have enacted their own shield laws,[15] many of them similar to Pennsylvania's.

---

15. *See* Ala.Code § 12–21–142 (1975); Alaska Stat. §§ 09.25.150–.220 (1983 & Supp.1984); Ariz.Rev.Stat.Ann. § 12–2237 (1982); Ark.Stat. Ann. § 43–917 (1977); Cal.Evid.Code § 1070

Making exceptions to the Shield Law would impose a considerable burden on the state because of the inevitable uncertainty to which the exception would lead. Parties could not be certain that their conversations and tips would be confidential and protected, and the stream of information flowing to reporters and then to the public might be severely diminished. No sensitive observer could deny that the balance is a close one about which reasonable people could disagree. Nevertheless, I believe that the balance tilts in favor of the state. The plaintiff is not denied his opportunity to bring his case to court and have it heard; victory, while not easy, is also not impossible.[16] Thus, I believe that the Shield Law survives the *Matthews v. Eldridge* analysis, and I concur with the majority on this point.[17]

(West Supp.1985); Del.Code Ann. tit. 10, §§ 4320–4326 (1974); Ill.Ann.Stat. ch. 110, §§ 8–901 to –909 (Smith-Hurd 1984); Ind.Code Ann. § 34-3-5-1 (Burns 1973 & Supp.1984); Ky. Rev.Stat.Ann. § 421.100 (Baldwin 1979); La. Rev.Stat.Ann. §§ 45:1451–1454 (1982); Md.Cts. & Jud.Proc.Code Ann. § 9–112 (1984); Mich. Comp.Laws Ann. § 767–51 (West 1982); Minn. Stat. §§ 595.021–025 (1982); Mont.Code Ann. §§ 26–1–901 to –903 (1983); Neb.Rev.Stat. §§ 20–144 to –147 (1977); Nev.Rev.Stat. § 49–275 (1981); N.J.Stat.Ann. § 2A:84A–21 to –21.9 (West Supp. 1984–1985); N.M.Stat.Ann. § 38–6-7 (Supp.1984); N.Y.Civ.Rights Law & 79–h (McKinney 1976 & Supp.1984–1985); N.D.Cent. Code § 31–01–06.2 (1976); Ohio Rev.Code Ann. §§ 2739–04–12 (Page 1981); Okla.Stat. tit. 12, § 2506 (1981); Or.Rev.Stat. §§ 44.510–540 (1983); 42 Pa.Cons.Stat.Ann. § 5942 (Purdon 1982); R.I.Gen.Laws §§ 9–19.1–1 to –3 (Supp. 1984); Tenn.Code Ann. § 24–1–208 (1980).

**16.** As the court in *Samuelson v. Susen,* 576 F.2d 546, 552 (3d Cir.1978) said about Ohio's shield law: "No doubt the statutory provisions affect the manner in which plaintiff may develop evidence to support his defamation claim. Plaintiff is not, however, foreclosed from prosecuting his claim with other evidence, both direct and circumstantial."

**17.** Two other federal constitutional issues deserve mention. First, defamation plaintiffs are required to show actual malice with "convincing

clarity," *Bose Corp. v. Consumer Corp.,* 466 U.S. 485, 511, 104 S.Ct. 1949, 1965 (1984); *Gertz v. Robert Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), but there is some question whether the convincing clarity standard applies at the summary judgment stage. That is, to deny a defendant's motion for summary judgment must a district court conclude that a reasonable jury could (i) find existence of actual malice, or (ii) find existence of actual malice *with convincing clarity* (in either case on the basis of the evidence taken in the light most favorable to the plaintiffs)? The district court relied upon *Liberty Lobby Inc. v. Anderson,* 746 F.2d 1563, 1569 (D.C.Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 2672, 86 L.Ed.2d 691 (1985); *but see Yiamouyiannis v. Consumers Union,* 619 F.2d 932, 940 (2d Cir.1980), and ruled that the plaintiff only had to satisfy the first, weaker, requirement to defeat the defendant's motion. It found that the plaintiff had failed to meet even this lesser burden. On account of the lower court's disposition, we need not resolve this issue.

Second, although the majority does not discuss it, I believe that our scope of review is plenary on account of *Bose, supra.* *See Bender v. Williamsport School Dist.,* 741 F.2d 538, 542 n. 3 (1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 1167, 84 L.Ed.2d 319 (1985). This court thus differs with *Liberty Lobby, supra,* which held that *Bose* did not apply to court of appeals review of summary judgments.